## A. B. (JACK) WALLER v. STATE.

No. A-3571. Opinion Filed May 2, 1921.
Rehearing Denied Aug. 3, 1921.
(199 Pac. 224.)

(Syllabus.)

1. Appeal and Error—Discretion of Court—Order of Admission of Evidence. Where evidence admitted is competent, ordinarily the

order in which it is admitted will not constitute reversible error.

2. **Trial—Evidence in Rebuttal—Discretion of Court.** Where evidence strictly rebuttal has been admitted in chief, without objection, it is discretionary with the trial court to permit further evidence along the same line to be admitted in rebuttal.

3. **Appeal and Error—Discretion of Court—New Trial—Newly Discovered Evidence.** Motions for a new trial on the ground of newly discovered evidence are addressed to the discretion of the trial court. The trial court's action in overruling such a motion will not be disturbed unless a manifest abuse of discretion appears.

Appeal from District Court, Canadian County; Edward Dewes Oldfield, Judge.

A. B. (Jack) Waller was convicted of the crime of manslaughter in the first degree and sentenced to serve a term of 20 years' imprisonment in the state penitentiary and appeals. Judgment affirmed.

On the 10th day of June, 1918, the county attorney of Canadian county filed in the district court of said county an information charging plaintiff in error, A. B. (Jack) Waller, hereinafter referred to as defendant, with the crime of having murdered one Clarence Patterson in said county on the 19th day of May, 1918. Defendant was put upon trial before a jury, which, on the 10th day of December, 1918, returned a verdict of guilty of manslaughter in the first degree, and assessed the punishment at 20 years' imprisonment in the state penitentiary at McAlester. A motion for a new trial was presented on the 21st day of December, 1918, overruled, and proper exceptions taken, and on the same date judgment and sentence was pronounced in conformity with the verdict rendered.

Defendant excepted to certain rulings of the trial court, which will hereafter be more specifically set out in the body of the opinion, and has properly perfected an appeal to this court from the judgment rendered against him.

A short narrative statement of the material facts is as follows:

Defendant, at the time of the commission of the alleged homicide, was the marshal of the town of Yukon; deceased was at that time living on a farm about three miles distant from Yukon, and had lived in Yukon and in that immediate vicinity during the entire period of his life, to wit, 27 years. The killing occurred on the main street of Yukon, near the hour of eleven p. m. on Sunday night, the 19th day of May, 1918.

Apparently there was a feeling of hostility toward deceased on the part of defendant, and there is also certain evidence to indicate a like feeling by deceased toward defendant. This feeling on the part of defendant was caused by certain alleged remarks that deceased had, a short time previous to the commission of the alleged homicide, made concerning defendant and a woman by the name of Wallace, who had obtained a divorce from her husband in the district court of Canadian county some two or three months prior to the homicide, in which proceeding defendant was a witness in her behalf. Defendant contends that deceased made disparaging and untruthful statements concerning the relations existing between defendant and the Wallace woman, and while a witness upon the stand defendant admitted that these statements angered him, and that he was mad at deceased at the time of the commission of the homicide. This condition of defendant's mind will more fully appear by excerpts taken from his testimony, subsequently incorporated in this statement.

On the day immediately preceding the homicide, late in the evening, defendant appeared at the residence of Herman Ellis in the town of Yukon, at which place Mrs. Wallace had stayed when residing in the county, and according to the testimony of Mr. and Mrs. Ellis, defendant was in an angry mood, and stated in substance that he had come down there "to straighten up some black stuff that Ellis and his wife and Clarence Patterson had been telling about him," and further stated that he was going to clean up on the bunch, and was

going to begin on Ellis first if he caught him down town. Ellis and his wife and deceased were friends, and on the day of the killing, deceased had been to their home in Yukon and had taken supper there, staying at that place on account of a very heavy rain that occurred that day and night until just a short time before he was killed.

Deceased left the home of Ellis, according to the state's evidence, ten or fifteen minutes before he was killed. Deceased came into town on horseback, and had left his horse in a barn in another part of town, some distance from the Ellis home. Before leaving the Ellis home that night, deceased was provided with a brown overcoat that belonged to Mr. Ellis, which was buttoned closely around him and pinned at the collar with a safety pin to protect him against the rain. He was also provided with a pair of heavy high overshoes. After leaving the Ellis home, deceased went up town, purchased a box of tobacco, went to a drug store to get some medicine for his mother, lighted his pipe and started down the main street east from the drug store, smoking his pipe and traveling in the general direction of the barn where his horse had been left. The evidence is that the overcoat deceased was wearing was securely buttoned and pinned when he left the drug store.

About a block east of the drug store deceased and defendant met, deceased going east and defendant going west, on the north side of the main street. The sidewalk at that point was about twelve feet wide, made of concrete blocks about four feet square. Deceased was traveling near to the outer part of the sidewalk while defendant was up next to the buildings. There were several people in the front part of a hotel across the street south about the distance of one hundred feet from the place where the homicide occurred. There were others in the drug store and pool hall, which was west and on the same side of the street where the killing took place a distance of approximately 150 to 200 feet. There were no witnesses at the

immediate place of the killing except defendant and deceased.

Some parties who were across the street opposite heard the report of eight or nine pistol shots, four or five in rapid succession, then a pause of some seconds, and four or five more. It was dark at the point of the killing, there being no lights except some in the back part of the store rooms in front of which the killing took place. Parties across the street could distinguish objects at the point of the killing and could see the flashes of the guns and saw one of the parties fall.

The proprietor of the hotel, one Ellison, testified that the person doing the shooting, whom he at that time believed to be Waller, fired several shots at the other person, who was standing some 20 to 25 feet southwest at the time, and that after the deceased fell and was lying upon the pavement, defendant pulled a second pistol from his person and fired four or five additional shots into his prostrate body. That defendant deliberately walked from the scene of the homicide to the telephone office, and the witness Ellison followed him up on the opposite side of the street so that he could get a good view of who it was, and then clearly recognized defendant as the person who had done the shooting.

Another witness for the state, who was the agent of the Rock Island Railroad Company at Yukon, testified that about ten or fifteen minutes prior to the killing, he had gone home from town and passed defendant standing in the doorway of a store right at the scene of the killing, and that defendant was apparently hiding in a recess which led into said doorway at the time such witness passed.

The defense interposed was self-defense, defendant testifying that he shot deceased to protect himself against an attack which he believed deceased was then about to make upon him; and in this connection we quote rather fully from the transcript of the evidence of defendant as follows:

On direct examination, defendant testified in part as follows:

"Q. Now, explain to this jury, Mr. Waller, the circumstances surrounding the shooting that occurred there on the street, in the first place, what side of the street was you on? A. The north side. Q. What side of the street was he on? A. On the north side. Q. In what direction were you going? A. I was walking west. Q. As you walked west who did you see? A. I met Patterson walking east. Q. About where was it now, on that north side of that street when you first saw Patterson? A. It was right along in front of the Mulvey Mercantile store. Q. Now, go ahead, Mr. Waller, and state what occurred when you was walking west and he approached to the east. A. I saw I was meeting Patterson. I always called him Pat and I inclined to the other side of the street. Q. How could you tell you were meeting him, what kind of a night was it? A. It was a very dark night and we had had a pour down rain, but there was lights in the Yukon's National Bank and Mr. Stafford's confectionery and I could see him when he came between those lights. The buildings lighted up enough so I could see who I was meeting. Q. As he came from the west toward the east he was between you and those lights? A. Yes. Q. There was a canopy over the sidewalk in front of the store? A. Yes, sir, a metal canopy. Q. How about it being light or dark under there? A. It was pretty dark all along there. Q. Now, you saw him and how far away was he when you recognized him? A. Well, I don't know exactly but I judge 15 to 20 feet, may be not that far. Q. When you recognized him? A. Yes. Q. When you did recognize him what did you do? A. I inclined toward the other side of the sidewalk. Q. Which side would that be? A. The north side, if I remember right. I was walking near the center of the walk. Q. And about what part of the sidewalk was he occupying, as he walked toward you? A. I don't believe very far from the center, and he was nearer the curb than the building. Q. He would be then a little south of the center? A. Yes. Q. You inclined as you say to your right or to the north? A. Yes. Q. And closer to the building? A. Yes, sir. Q. Then what occurred? A. Well, when we got along about, I don't know the distance exactly, but I judge eight to ten feet, Pat stopped and I said,

'Pat, go on, I don't want any trouble with you, I have given you the sidewalk.' Q. At that time were you still walking or were you stopped? A. I had stopped. Q. And by that time you had inclined up against the building? A. yes, I know I had. Q. After you had said that and after having angled off toward the building then what occurred? A. He just stuttered two or three times and threw his arm back. Q. Which arm? A. His right arm. Q. What did he do, how did he throw it back? A. He threw it back like he was going to his pocket at his side. Q. Was he between you and the light so you could see the motion of his arm? A. Yes. Q. What did he say? A. He stuttered two or three times and then said, 'God—.' Q. Then what did he do? A. Made a step or two towards me, I don't know whether more than one step or possibly two. Q. When he threw his arm back and started towards you what did you do? A. I jerked my gun and began to shoot. Q. How many guns did you have? Describe them. A. I had two automatics, a three-eighty in my left coat pocket and a .45 in my hip pocket. Q. Those were the two guns that were introduced here? A. I did not look at them but I judge they were. Q. You had the big gun in your right hip pocket? A. Yes. Q. What kind of a coat did you have on? A. I had on a large coat, it was an old winter coat, brown clothes. Q. Where did you have the little gun? A. In my left coat pocket. Q. You say you reached for your gun, did you reach for both of them at once or which of them did you reach for first? A. I put my hands on my guns, both of them. Q. Then what did you do when you reached for your guns? A. I jerked my guns as quick as I could and began to shoot. Q. Which did you jerk first or did you jerk both of them at once? A. The small gun hung in my pocket and I had trouble getting it out and I shot the big gun first. Q. Describe about getting those guns out, that is what I want. A. I had the small gun in my left coat pocket and I had the big gun in my right hip pocket and I got it out first. Q. Go right ahead. When did you get the little gun out, how soon did it come loose? A. I don't know just when it did. Q. Do you know what you did when it did come out? A. Yes, sir; I shot, but I don't know how many shots. Q. Do you know how many shots you had fired with the big gun when the little gun came out and you began to

shoot with it? A. No, sir; I do not know. Q. You reached for both, to begin shooting with both at once? A. Yes, sir. Q. Do you know how many shots with either one or how many you fired in all? A. No, sir; I do not. I will plead guilty to all of them but I don't know how many shots I fired. Q. After you had began shooting what happened, now do you know what happened after you shot the first, second or third shots? A. No, sir; I do not. Q. Do you know what Patterson did after you began shooting? A. He fell part of the way down to his hip, after I began shooting but I don't know how many shots I had fired before he fell. Q. Then what happened? A. I shot until he fell to the sidewalk. Q. Until he fell clear down to the sidewalk? A. Yes. Q. Then what did you do? A. I walked straight away and went to the telephone office west. Q. Do you know whether you shot him in the back or not? A. No, sir; I do not.''

On cross-examination, the defendant testified in part as follows:

''Q. And it was then, after you had made numerous trips there to see Mrs. Wallace that the talk became prevalent in the community that you were too intimate with Mrs. Wallace? A. No, sir; there is not a thing to it. Q. And you sought to saddle the responsibility upon Clarence Patterson for the talk that was going around?

''By Mr. Fogg: Objected to as incompetent, irrelevant and immaterial and argumentative.

''By the Court: Overruled.

''By Mr. Fogg: Exceptions.

''A. No, sir. Q. And it was then that you became angry at Clarence Patterson and the Ellises? A. No, sir. Q. You had, I believe you say, heard that Clarence had made some statements that you were too friendly with Mrs. Wallace? A. Mrs. Wallace's husband told me that, the first one. Q. That made you mad, didn't it? A. You bet it did. Q. And later on you went up to the Ellis's house and took your friend, Claude Johnson, another deputy sheriff, with you? A. Mr. Parker—— Q. Just answer my question. A. Yes, sir, I done that. Q. Were you armed when you done that? A. Yes, I

had one gun on me. Q. You did not have these two pistols with you? A. I had one of them. Q. Which one? A. I don't remember, the large gun, I expect. Q. Where did you buy this .45 automatic? A. Soon after I went to work at Yukon. Q. When did you buy the little gun? A. About two weeks after Jason Clark went into office, I don't know just how long that has been. Q. When you got to Ellis's home you talked to Herman about what Clarence and his wife said about your being intimate with the Wallace woman or what they are reported to have said? A. I was talking with them all. Q. You said to Herman and his wife, 'I came up here to investigate some black stuff that you and Clarence Patterson had been telling on me?' A. I did not name Clarence Patterson at that time. Q. During the conversation you mentioned his name? A. One time. Q. And Mrs. Ellis said to you, 'Clarence Patterson will face you in anything that he has said,' in substance did she say that to you? A. She said, 'Clarence Patterson is fixed for you and will tell you so at any time.' Q. 'Is fixed for you,' that was her expression was it? A. That was her words. Q. You said to Mrs. Ellis—you called this woman a liar, didn't you? A. No, sir; I did not. Q. You were still mad at Clarence Patterson, were you? A. Not near as mad at him as I was at Lou and Herman Ellis. Q. You was mad at them? A. I was sore at them, yes. Q. Did you tell Herman Ellis that you would lay off your gun and whip him? A. I did not. Q. That the first time you met him down town that you would lay off your gun and whip him? A. I did not. Q. Or do anything to him? A. I did not. Q. What time of the day were you up there? A. Late in the evening, I don't remember the time of the day. Q. That was on Saturday, May the 18th of this year? A. Yes, sir. Q. And the day before you killed Clarence Patterson? A. Yes, sir. Q. You know a man by the name of Joe Beckner, do you not? A. Yes, sir. Q. You had a talk with Joe Beckner in the city of Yukon on the same Saturday, did you not? A. Yes, sir. Q. And you accused Joe Beckner of shielding Clarence Patterson did you not? A. Yes. Q. And he said, 'In what way,' and you said, 'Clarence Patterson will talk about me,' that Clarence Patterson would talk to Joe Beckner and that he, Joe Beckner, would not tell you what Clarence said? A. Not in that way; no, sir.

Q. Did you, in substance? A. I don't know whether you would term it in substance, I can tell if you will let me, what I said. Q. First answer whether you had a conversation in substance to that effect, can you, or not?

"By Mr. Fogg: Objected to as incompetent, irrelevant and immaterial and a repetition.

"By the Court: Overruled.

"By Mr. Fogg: Exceptions.

"A. What is the question before that, in substance to what; I don't understand you.

"By the Court: Read the record in the previous question to the witness.

"Q. And he said to you, 'In what way,' and you said, 'Clarence Patterson will talk about me,' that Clarence Patterson would talk to Joe Beckner and that he, Beckner, would not tell you what Clarence said. Q. Did you state that or that in substance? A. I don't know whether you would term it in substance to that or not. I can tell you what I said. Q. Did you say to Mr. Beckner at that time, that Herman and Lou Ellis will tell Clarence Patterson certain things about me and Clarence will tell it over town? A. Yes, I told him that. Q. And that Beckner knew about it but would not tell you what Clarence said? A. I did not say that. Q. Did you say anything in substance to that effect? A. I don't know whether in substance or not, if you will let me, I believe I can tell you word for word what I said to him. Q. Did you tell Joe Beckner that Clarence had been talking about you? A. Yes. Q. And had intimated that your conduct with Mrs. Wallace was not proper? A. Intimated that it was not proper? Q. That Clarence had intimated that your conduct with Mrs. Wallace was not proper? A. Yes, sir; I said that. Q. And you were mad about it? A. Yes, I was mad about it and had been for two or three months. Q. You were mad when you were talking to Beckner? A. Yes, I was pretty sore at Joe at that time. Q. And you was sore at Clarence Patterson at that time? A. Yes, and Lou and Herman Ellis. Q. And then you said, 'Beckner, If there are three funerals in town the town would be bet-

ter off'? A. Not in that way. Q. Did you make that statement? A. Not in that way. Q. Did you intimate that there would be funerals in the town of Yukon? A. No, sir; I did not. Q. Did you tell him if there was three funerals in Yukon that it would be better off? A. In a way but not in the way you are putting it. Q. In what way was it? A. Will you let me tell it in my own way? Q. State what you said about the funeral. A. I went to Joe and said, 'Joe, how is that you come in and warn me about Ellis and his gun and you don't warn me about Clarence Patterson when you know that Clarence Patterson has been threatening my life more than Herman Ellis has,' and he looked a little dashed and said, 'Jack, Clarence is awfully high tempered,' and I said, 'What of that?' and he said, 'Clarence comes to my place nearly every time he comes to town and I can keep Clarence under my thumb anywhere I want him when I know it,' and he said, 'That is the reason I didn't tell you, I have been watching him.' Q. Didn't you ask Joe Beckner at that time—

"By Mr. Babcock: Wait a minute. He has asked the witness a question and I want him to have an opportunity to answer it.

"By Mr. Williams: Oh, is he not through yet? All right, go ahead, go ahead, Mr. Waller, if you have anything else to say. A. And I said, 'Joe, all this talk, you know as much about it as others, you have been telling some of it yourself, you and Clarence, and I don't believe you and Clarence have manufactured this dirty talk on me but you are telling it just the same when you know where it is coming from,' and we went on talking and I don't remember our words just exactly but I said, 'If people only wanted to be peace-makers instead of trouble makers this would be a better world to live in,' and he said, 'Yes, that is true, Jack, but you will find fellows around town, most any town you go to that try to create trouble any where you go.' He said, 'That is just the trouble now, there is parties carrying things to Clarence and Win Wallace, and he really referred to Win more than he did Clarence, but he spoke of Clarence and Win had told him that three parties had told him—

"By Mr. Williams: I object to that as hearsay.

"A. Well, I said to Joe in regard to these three parties that had been carrying talk to Win Wallace, and I said, 'It's a damn cinch this place would be better off if it had a few funerals.' Q. And you included Clarence Patterson in the funeral list? A. I did not say it. Q. Were you including him in the funeral list? (No answer.) Q. Answer my question, were you or not? A. Yes, that would have included Clarence Patterson." * * * "Q. How far were you from Clarence Patterson when you first recognized that it was him? A. I don't know; I judge from 18 to 20 feet. Q. Come down and show me how close you were to him. A. Well, you will have to get back there some more. Q. All right, you put me where you killed him, and tell me when to stop. (Here counsel for the state walks backward to get the distance.) A. About there. Q. Now is that about right? A. Yes, sir. Q. You were that distance away from him when you first observed him? A. When I first noticed who I was meeting. Q. What was the first thing that he did? A. He kept on walking toward me. Q. Now, you are representing Patterson and you walk towards me and show me just how he did. (Witness here makes demonstration, walking towards counsel.) Q. What did he say? A. Did not say anything. Q. What did you say? A. I said, 'Pat, I don't want any trouble with you.' Q. And he never spoke a word? A. Not then. Q. You said what? A. I said, 'Pat, go on, I don't want any trouble with you now, I am giving you the sidewalk.' Q. That is all you said? A. That is all I said. Q. What direction were you from him when you said that? A. Northeast. Q. About how many feet? A. I don't know exactly, I would judge about the distance we are apart, may be not quite that far, eight or ten feet. Q. Did you get any closer before you began to fire? A. No, sir. Q. Was he smoking his pipe when you fired the first shot into his body? A. No, sir; if he was I did not notice it. Q. Patterson never said a word? A. Yes, sir. Q. Up to that time, had he? A. No, sir. Q. What did he then say? A. He said, 'G-G-G-G-Göd.' Q. Didn't he say, 'Oh, God'? A. No, sir. Q. Didn't he say, 'Oh, God,' after you fired three shots into his body? A. No, sir. Q. Is not that when he exclaimed, 'Oh, God'? A. No, sir; never said it. Q. Did you ever get any nearer to him than you have indicated during the firing? A.

I did not. Q. Did you ever step toward him? A. I did not. Q. Did he ever step toward you? A. Yes. Q. After he stopped you had this conversation, did he move toward you thereafter? A. Yes. Q. How far? A. One or two steps. Q. You had not opened fire yet? A. No, sir. Q. You testified that you were about ten feet from him when you opened fire? A. Yes. Q. After you opened fire he did not advance on you did he? A. No, sir. Q. Then the nearest he was to you was ten feet? A. Wait a minute; I don't know whether he did or not; I don't think he did. Q. Did what? A. I don't think he came any nearer, not more than one or two steps. Q. Then the nearest he was to you was about ten feet? A. I don't know. Q. The distance you indicated a while ago? A. It was about that when I shot. Q. He did not advance towards you after that, did he? A. He made one or two steps toward me. Q. After you fired upon him? A. I don't know what he done then. Q. He did not advance after you fired, did he? A. I don't know. Q. Which gun did you fire first? A. The large gun. Q. That was in your right pocket? A. Right hip pocket. Q. You tried to get them both at once? A. Yes. Q. And the little gun hung? A. Yes. Q. Did you see old man Ellison across the street? A. There were people across the street. Q. Did you know that old man Ellison was looking at you when you were trying to get both of those guns out of your pocket? A. No, sir; I did not know anything about it. Q. You fired how many shots with this large gun before you got the small gun out of your pocket? A. I don't know. Q. You are an officer? A. Yes, was at the time. Q. And used to shooting guns? A. Yes. Q. You did not see anything in this boy's hand did you? A. No, sir. Q. You never saw a thing in his hand? A. No, sir. Q. He had on an overcoat, didn't he? A. Yes. Q. And he had this coat buttoned up, didn't he? A. I don't know. Q. Did you hear him coming along on the sidewalk? A. Yes. Q. Did you hear his footsteps? A. I guess I did; I don't remember. I naturally would. Q. He had on rubber overshoes, didn't he? A. I don't know. Q. You say you guessed you heard him coming, what do you say now? A. I don't know. Q. You said a while ago you guessed you heard him coming? A. I want to change it then and say I don't know. I saw him coming. Q. The young

man was traveling east and you could not see his right hand, could you? A. No, sir. Q. You could see his left hand could you not? A. No, sir. Q. At the time you fired the first shot could you see his right hand or his left hand? A. No, sir. Q. When you fired the remainder of the shots you did not see his right hand or his left hand? A. No, sir. Q. You could not tell what he was doing with either of them, could you? A. No, sir.''

On redirect examination, defendant testified in part as follows:

''Q. You were asked by Mr. Williams when he had that overcoat on that when you fired the first shot could you see the right hand of Patterson? A. No, sir; I did not. Q. Why could you not see it? A. Because it was so dark. Q. Had you seen his right hand move before you fired?

''By Mr. Williams: That's objected to as leading and suggestive.

''By the Court: Overruled.

''A. No, I can't say that I had, I had not. Q. What did you see him do when he stopped?

''By Mr. Williams: Objected to as assuming a fact not proven.

''By the Court: Sustained.

''Q. You described a while ago, Mr. Waller, as to what occurred referring to the time that Patterson stopped and you angled off to the right, did you or not see Patterson make any movement before he started toward you?

''By Mr. Williams: Objected to as leading and suggestive and a repetition.

''A. Yes, sir; he threw his arm around by his side. Q. Which arm was that he threw down? A. His right arm. Q. Now after he did that did you see his right arm again? A. No, I can not say that I did. Q. When you reloaded these guns that had been after you had gone to the telephone office

and all around that block and back to the city jail? A. Yes. Q. I believe you said you carried both guns with you at all times when on duty, that was your habit as a rule? A. Yes, sir. Q. Now, Mr. Waller, when you saw Clarence Patterson stop and saw him throw his right hand down toward his pocket on his right side and as he came one or two steps toward you with the expression you have stated, what conclusion did you arrive at at that time in your mind as to what he was going to do?

"By Mr. Williams: Objected to as leading and suggestive and calls for a conclusion.

"By the Court: Overruled.

"A. I believed that he was going to try and kill me. Q. Was that the reason you shot? A. Yes, sir, that is the reason I shot."

There is also evidence of certain alleged threats which were made by deceased against defendant, both communicated and uncommunicated; and in addition thereto, there is evidence of specific acts of violence alleged to have been committed by deceased on parties other than defendant on several occasions from the time deceased was about fourteen years of age to the time he was killed, defendant testifying that he had heard and known about these various alleged acts of violence by deceased. There is also evidence by certain witnesses in behalf of defendant that the general reputation of deceased as a peaceable, law-abiding citizen in that community was bad. In rebuttal, the state introduced a number of witnesses who testified that the general reputation of deceased for peace and as a law-abiding citizen was good.

Immediately after the killing parties went to the scene with lanterns and flash lights, and made a thorough search in each direction from the body for a space of from ten to twenty-five feet. Seven or eight empty pistol shells were found, and the pipe of deceased was found about one foot from his face. Nothing else than these articles was found until about six o'-

clock, or a little later, after broad daylight the next morning. A witness by the name of Brakefield testified that he picked up a closed, single bladed, spring back knife about six or eight feet west of where deceased's head had laid, out in the street just off the curbing about five or six inches. A witness by the name of Brakefield also testified, as did several other witnesses who searched that place the night before, that no knife was there when the search was made the night before.

Following the killing, investigation also was made of the sidewalk beneath where the body had laid, and three or four indentations within a space covered by an ordinary saucer were found in the sidewalk. These indentations were about the size of ordinary pistol bullets, and when rubbed with the finger disclosed a metallic polish around the same. Apparently they were indentations made by defendant's pistol shots at the time deceased was lying on the sidewalk.

The physician who examined deceased after the killing testified that there were eighteen holes in his body, counting both entrances and exits of bullets. These shots were of two different sizes, and the entrances were located in the front left side and in the rear of the body, one shot also breaking the bone in the wrist on the right hand of deceased. Numerous of these wounds were testified to be necessarily fatal, one of which through the heart would cause instant paralysis.

The state in rebuttal introduced the mother of deceased and other relatives, who testified that deceased did not own and never carried a knife of the kind and description found at the scene of the killing. Further, deceased's pocket knife was found in his every-day clothes at home after the killing. The killing having occurred on Sunday, deceased wore his best clothes to town that day.

In surrebuttal defendant introduced a witness who testified that he had seen deceased with a spring back knife like the one found at the scene of the killing about three or four

months before the killing, and another witness testified to having seen deceased with a knife with a large blade prior to the killing but could not describe the knife.

This record is very voluminous, containing approximately 900 typewritten pages. There are other facts and circumstances in the record of the evidence unnecessary to detail as they have but slight bearing upon the issues presented, and the foregoing statement is considered sufficient for the purposes of this opinion.

Pruett, Sniggs, Patterson & Morris, Babcock & Trevathan, and Fogg & Bennett, for plaintiff in error.

S. P. Freeling, Atty. Gen., W. C. Hall, Asst. Atty. Gen., E. L. Fulton, Asst. Atty. Gen., for the State.

MATSON, J. (after stating case as above). It is first contended that the trial court erred in permitting the state, over the objection and exception of defendant, to introduce evidence in rebuttal to the effect that when the search was made at the scene of the homicide immediately thereafter no weapon of any kind was located at the place where the single-bladed, spring-back knife was found the next morning.

The state in chief had introduced a number of witnesses who testified that immediately after the commission of the homicide, a search was made of the scene of the homicide with the aid of flash lights and lanterns; that this search covered a space approximately in a radius of 25 feet surrounding the place where the body lay; that no articles were found as a result of that search except certain empty pistol shells and the pipe of deceased.

The defense thereafter introduced witnesses who testified that on the morning following the commission of the homicide, at about six o'clock a. m., a single-bladed, spring-back knife was found in the street near the gutter not very far from where

deceased's head lay after he fell on the sidewalk. Thereafter, the court permitted the state in rebuttal to introduce witnesses who testified that the search made the night before covered the particular place where this knife was found the next morning, and that there was no knife at that place when the search was made the night before.

In introducing evidence in chief to the effect that no knife was found when the first search was made, the state anticipated what the defense would be, and that the defense would likely introduce evidence that a knife had been found at a later time. This evidence was permitted to go to the jury in chief without objection on the part of defendant. Strictly speaking the evidence was rebuttal, and perhaps would have been excluded from the state's evidence in chief had objection been made thereto. Further evidence along this line, however, was, in our opinion, proper to be admitted in rebuttal of defendant's evidence as to the finding of the knife, to make more definite and certain that the search which was made immediately after the homicide covered the exact spot where the knife was found, as it did not clearly appear from the evidence admitted in chief that a close and thorough search had been made at the exact place where the knife was thereafter found.

However, had this been exclusively evidence in chief, it was discretionary with the trial court, in the furtherance of justice, to permit it to have been introduced in rebuttal. Tingley v. State, 16 Okla. Cr. 639, 184 Pac. 599.

Under the issues in this case, this evidence was competent, and the order of its admission did not constitute such error as should result in a reversal of this judgment.

It is also contended that the trial court erred in overruling the motion for a new trial on the ground of newly discovered evidence. The evidence alleged to have been newly discovered is attached to the motion for a new trial in the form of affi-

davits of three parties, who claim that about three or four months prior to the commission of the homicide they saw deceased in possession of a single-bladed, spring-back knife of the description found at the scene of the homicide.

Motions for a new trial on the ground of newly discovered evidence are addressed to the discretion of the trial court, and the ruling of the trial court on such a matter will not be disturbed unless a manifest abuse of discretion appears; the presumption being that the discretion was properly exercised. Noel v. State, 14 Okla. Cr. 548, 174 Pac. 293.

In the trial of this case defendant introduced evidence of at least one witness who testified positively that he had seen deceased in possession of the knife found at the scene of the homicide or one exactly like it. The alleged newly discovered evidence, therefore, was cumulative. It appears from the record that the evidence was not newly discovered but that new witnesses were discovered to the same evidence of which defendant was possessed at the time of the trial. It is almost incomprehensible that defendant could, within nine days after his conviction, discover these three new witnesses, all of whom lived in the vicinity of where the crime was committed, although for a period of seven months prior to the trial he was unable to discover them.

Deceased had lived in the immediate vicinity of the commission of the homicide for over 20 years; he was well known to practically all the inhabitants of that community. It must have become a matter of public notoriety, where the parties involved were as prominent in the community as deceased and defendant were in this case, that on the morning immediately following the commission of the homicide a very unusual spring-back, large-bladed knife was discovered. Certainly had this knife been the property of deceased, with his wide acquaintance in the community, defendant by the exercise of ordinary diligence would have before the trial discovered more than one witness who would have been able to identify

this particular knife as the property of deceased. Especially is this conclusion forced upon the court in view of the fact that within nine days immediately after his conviction, defendant was able to discover three other witnesses whom he claims would, if a new trial were granted, testify that they had seen deceased in possession of a knife similar to the one found at the scene of the homicide.

We are of opinion, therefore, that there was no abuse of discretion upon the part of the trial court in overruling this motion for a new trial on the ground of newly discovered evidence, (1) because the evidence was cumulative; (2) because there is no showing of any reasonable diligence used to discover the particular witnesses; and (3) in view of defendant's own testimony, the court is clearly of the opinion that had these alleged newly discovered witnesses been introduced upon the trial of this case, no honest and intelligent jury could arrive at a result different than the conviction of this defendant, either for murder or manslaughter. Howey v. State, 9 Okla. Cr. 453, 132 Pac. 499.

We have copied full excerpts of defendant's testimony in the statement of this case, and it is clear from defendant's testimony itself that an acquittal should not have resulted. As the court views the evidence, defendant was extremely fortunate that the result of the trial was a conviction of the lesser degree of felonious homicide than murder.

The petition in error contains assignments not presented in the brief. This being a felony conviction, the court has taken occasion to examine these assignments also. The instructions given fairly and fully covered the law of the case as applicable to the evidence. The substance of the law contained in the requested instructions was covered by the court in the general charge in a manner as favorable to defendant as the evidence warranted. The trial court was very liberal to defendant in the admission of evidence in his behalf, and in our

opinion accorded defendant a fair and impartial trial in every respect.

Judgment affirmed.

DOYLE, P. J., and BESSEY, J., concur.